UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WATERVIEW POWER GROUP LLC,<br><br>Plaintiff,<br><br>-against-<br><br>TENSORWAVE INC., VANTAGE DATA CENTERS CANADA QC24-B, LIMITED PARTNERSHIP and DARRICK HORTON,<br><br>Defendants. | X<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>X | Civil Action No.: __________<br><br>**COMPLAINT** |

Plaintiff Waterview Power Group LLC ("**Plaintiff**" or "**Waterview**"), by and through its undersigned attorneys, Herrick, Feinstein LLP, as and for its Complaint against TensorWave Inc. ("**TensorWave**"), Vantage Data Centers Canada QC24-B, Limited Partnership ("**Vantage**") and Darrick Horton ("**Horton**") (collectively, "**Defendants**"), alleges as follows:

## NATURE OF THE ACTION

1. Waterview, acting as a broker to TensorWave – an AI-focused cloud platform that provides high-performance, memory-optimized infrastructure for secure AI compute, an alternative to the Nvidia-dominated AI compute ecosystem – originated, structured and then later rescued an all-but-dead deal between TensorWave and Vantage (or their respective affiliates and/or designees) for the provision of 32MW of critical IT load by way of Vantage's Québec City Hyperscale Data Center Campus (the "**Data Center**"). The economic structure of the proposed deal – that was ultimately subject to complex negotiations handled, at the request of TensorWave, by Waterview – was centered upon a negotiated cost per kW (energy/power) to be supplied by Vantage to TensorWave, paid monthly by TensorWave to Vantage (the "**Monthly Recurring Charges**" or "**MRC**"). Accordingly, though the acquisition of physical space at the Data Center

was an aspect of the deal, leasing the space was merely a consequence of the particular good being negotiated. Indeed, the dominant purpose of the negotiated transaction was for the delivery, by Vantage, of a specialty service, *i.e.*, delivery of 32MW of critical IT load (energy/power) to TensorWave.

2. Specifically, TensorWave – with credit support from Advanced Micro Devices, Inc. ("**AMD**") as its guarantor – sought to acquire a lease (through TensorWave's Québec special purpose entity) for approximately 32MW of critical IT load from the Data Center, owned by Vantage. To accomplish this, TensorWave sought Waterview's assistance in originating, structuring and negotiating the transaction for the IT capacity necessary for TensorWave's AI compute model, *i.e.*, negotiating a services contract.

3. Initially, Waterview and TensorWave agreed that Waterview's benefit for its services would be a percentage baked into TensorWave's MRC paid to Vantage (the "**Broker Fee**" or "**Fee**"). Said differently, the MRC that TensorWave was obligated to pay Vantage was to be set per kW of critical IT load. Of the MRC billed by Vantage to TensorWave, following receipt of the full MRC amount, Vantage would then remit an agreed upon 4% of same to Waterview as its Fee. Under this structure, though Vantage was the entity set to remit the fee to Waterview, the burden for providing the 4% Fee remained with TensorWave. The Fee paid to Waterview, by the structure of the transaction, would be remitted monthly.

4. Throughout the negotiation process, the 4% Fee that was initially agreed to between Waterview and TensorWave was reduced – with both Waterview and TensorWave's agreement – to 3%. Thereafter, TensorWave's conduct led Waterview to fear that the 3% Fee would not be paid or honored. Accordingly, Waterview – in a measure of good faith – extended an offer to accept 2% as its Fee, to be paid by Vantage post-collection of the MRC from TensorWave.

5. For reference to value, the 2% Fee is equivalent to approximately $22,000,000 in value based upon the structure of the proposed transaction at the time Waterview was improperly ousted by TensorWave.

6. Though a formal contractual agreement executed by both TensorWave and Waterview was never executed (not for lack of effort by Waterview), various writings sent by Waterview to both TensorWave and Vantage confirm the existence of the Fee structure as it evolved. While TensorWave ignored requests to affirm the agreement in writing, TensorWave continued to accept and direct Waterview's services even after receipt of Waterview's express writings that detailed the Fee structure. Accordingly, TensorWave's conduct – a failure to dispute those specific terms referenced in writings by Waterview in combination with TensorWave's continued requests for services, coupled with the oral representations made by TensorWave to Waterview – amount to the knowing acquiescence of the written terms promulgated by Waterview to TensorWave individually and in the presence of Vantage.

7. Moreover, Waterview is in possession of a recording of TensorWave's CEO wherein it is orally agreed that – in detailing the history of the Fee structure – TensorWave had agreed to the Fee structure presented by Waterview, *i.e.*, the 4% and then likewise agreed to the 3% modification.

8. The fact that TensorWave was obligated to cover Waterview's Fee was never in dispute. On the contrary, the Fee was expressly referenced throughout negotiations – by Waterview, TensorWave and even Vantage – as a material term to the negotiated transaction. No party ever disputed that Waterview was entitled to the Fee. Instead, knowing that a consummated deal necessarily included a Fee to Waterview for its services, Defendants accepted Waterview's services and now act to wrongfully cut Waterview out of the transaction to avoid satisfaction of

the Fee agreement. Indeed, Waterview is even referenced in the draft lease – prepared by Vantage and circulated amongst the parties – as TensorWave's broker. Moreover, a representative of Vantage messaged Waterview's principals inquiring as to what Waterview would do with $20,000,000 – thereby acknowledging that Vantage was aware of and understood the obligations of the Fee agreement, at least as it existed under the last proposed 2% structure offered by Waterview.

9. Moreover, disputes related to the Fee were – what Waterview now understands to be, at least in part – the result of alleged unauthorized representations made to Waterview by TensorWave's CEO related to the agreed upon Fee percentage. Indeed, following an agreement between Waterview and TensorWave's CEO to a 4% Fee, TensorWave's CEO requested a downward modification to a 3% Fee which Waterview granted in writing. Thereafter, TensorWave's CEO again attempted to negotiate a downward modification which Waterview rejected. It was only then – upon meeting with TensorWave's COO and Vice President of AI Infrastructure – that Waterview became aware that TensorWave's CEO did not have authorization from TensorWave's leadership team or board to authorize either the 4% or 3% Fees when he did.

10. Despite this lack of authority, TensorWave's COO and Vice President of AI Infrastructure conveyed that efforts would be made to determine whether TensorWave could honor the Fee structure agreed to by TensorWave's CEO. Alternatively, TensorWave represented that it would provide a proposal for restructuring the Fee. Despite this representation, TensorWave never provided an alternative proposal for restructuring the Fee and Waterview never accepted that it was not entitled to the percentage that it had expressly agreed to – a 3% Fee. Instead, following months of directed services by TensorWave, Waterview was cut out of the transaction by TensorWave shortly before the transaction was consummated. In so doing, TensorWave and

Vantage (and their affiliates and/or designees) reaped the benefits of Waterview's services without providing compensation.

11. To permit Defendants to retain the benefits conferred by Waterview's services without providing Waterview with payment for services upon the reasonable value agreed upon would be contrary to the agreements made and unjust.

## THE PARTIES

12. Plaintiff Waterview Power Group LLC is a Delaware Limited Liability Company. Its members are ST Equity Holdings LLC and Intangible Power LLC. ST Equity Holdings LLC is a Delaware Limited Liability Company. Its sole member is Saul Tawil ("**Tawil**"), a New Jersey resident. Intangible Power LLC is a Delaware Limited Liability Company. Its sole member is Vinh Thai ("**Thai**"), a New York resident.

13. Upon information and belief, Defendant TensorWave Inc. is a Delaware corporation with its principal place of business at 6611 Las Vegas Boulevard South, Suite 200, Las Vegas, Nevada 89119 or 6543 South Las Vegas Blvd. Las Vegas, Nevada 89119.

14. Upon information and belief, Defendant Vantage Data Centers Canada QC24-B, Limited Partnership is a foreign partnership formed under the laws of British Columbia. Upon information and belief, the general and limited partners of Vantage are not residents of either New York or New Jersey. Upon information and belief, its principal place of business is 700 Georgia St. W. Vancouver, BC V7Y 1K8. Further, upon information and belief, Vantage designates notices to its management company, Vantage Data Centers Management Company, LLC located at 200 Clayton St., Suite 450 Denver, Colorado 80206.

15. Upon information and belief, Defendant Darrick Horton is a Nevada resident with an address of 344 Cascade Mist Avenue, Las Vegas, Nevada 89123.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the action pursuant to 28 U.S.C § 1332(a)(1)/(2) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is a dispute between citizens of different states and/or citizens of a state and citizens of a foreign state.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions alleged herein occurred in this District. Specifically, Waterview performed all services at issue herein from its New York office, and the communications constituting Defendants' reflective requests for and acceptance of those services were directed into this District.

## RELEVANT FACTS

### Waterview Originates the Vantage Opportunity for TensorWave and Horton Authorizes the 4% Fee for Waterview's Services

18. Waterview is an advisory and brokerage firm that specializes in data center, power infrastructure and energy assets. Its principals, Tawil and Thai, have long-standing relationships across the data center and neocloud tenant markets.

19. Waterview's relationship with TensorWave and Horton began on or about April 25, 2026, when Waterview introduced TensorWave to a separate data center opportunity in Frankfort, Indiana. Days later, Waterview brought TensorWave the Vantage opportunity described herein.

20. In or about late April 2026, Waterview introduced TensorWave to available capacity for 32MW of power at Vantage's Data Center located in Québec.

21. An initial exploratory call between TensorWave and Vantage did not go well – with Vantage already prepared to walk away from the opportunity.

22. Despite that, Waterview kept the opportunity alive by negotiating a path forward and acting as the intermediary for TensorWave and Vantage, with AMD's direct involvement as TensorWave's guarantor.

23. On or about April 28, 2026, Thai emailed TensorWave's CEO, Horton, copying Tawil, transmitting a letter of intent ("**LOI**") that Waterview had drafted on TensorWave's letterhead and asked if TensorWave approved same for release to Vantage.

24. Therein, the proposed MRC was $145 per kW of critical IT load, "inclusive of a 4% advisory fee payable to [Waterview]".

25. Accordingly, the LOI proposed a compensation structure where TensorWave would be obligated to pay Vantage the MRC (which included Waterview's fee) and thereafter, Vantage would, upon receipt of same, be obligated to remit Waterview's Fee to Waterview.

26. Horton approved the LOI for release to Vantage. Accordingly, TensorWave – through Horton – adopted a document that priced Waterview's compensation, a 4% Fee from the $145 per kW, into TensorWave's proposed MRC to be paid to Vantage.

27. On or about April 30, 2026, after Vantage indicated that it would not pay a landlord-side commission, Tawil and Thai spoke with Horton by telephone about restructuring the LOI so that TensorWave, rather than Vantage, would pay Waterview's Fee. Horton stated that he was fine paying the Fee, and that TensorWave pays a buy-side fee where a landlord will not, because TensorWave still wants to see "those opportunities."

28. Waterview then put Horton's agreement in writing so that he would have it in front of him and acknowledge it. At or about 12:46 p.m. on April 30, 2026, Thai texted Horton: "Heads up- I'm making 2 changes, making it 32 M[W] critical and adding that you are paying our fee."

29. At or about 12:52 p.m. on April 30, 2026 – six minutes later – Thai sent the revised

LOI by email to Vantage's Vice President of Sales, Patrick DelPrete ("**DelPrete**"), copying Tawil and Horton. The revised LOI reduced the proposed MRC from $145 per kW to approximately $139 per kW, dollar for dollar by the 4% Fee, and restated the 4% Fee as TensorWave's obligation.

30. Horton, having received both the text and the email, did not object. His reply to the text at or about 12:55 p.m. on April 30, 2026 – 3 minutes later – was a joke about the spelling of his name, followed at or about 12:57 p.m. by a joke that TensorWave would be entitled to a "90% discount on fee for spelling it wrong" regarding the spelling of his name in Thai's email to Vantage.

31. Thus, the LOI was revised to reflect an MRC of approximately $139 per kW of critical IT load with Waterview's 4% Fee restated as an obligation for TensorWave to deliver directly to Waterview beyond the confines of the MRC itself.

32. Notably, these two versions of the proposed transaction are economically identical regarding the financial burden on TensorWave and entitlement by Vantage and Waterview.

33. Specifically, under the initial proposed LOI, TensorWave was responsible for paying Vantage an MRC of $145 per kW of critical IT load with Waterview's Fee being included therein for Vantage to then remit to Waterview while the revised LOI obligates TensorWave to pay Vantage an MRC of approximately $139 per kW of critical IT load with Waterview's Fee to be paid separate from the MRC by TensorWave.

34. Under either structure, TensorWave would be obligated on a monthly basis – whether as MRC to Vantage alone or MRC to Vantage plus separate Fee to Waterview – to remit $145 per kW of critical IT load.

35. And under either structure, Vantage would be entitled to a net MRC of approximately $139 per kW of critical IT load from TensorWave.

36. Finally, under either structure (of this initial offer amount), based upon 4%,

Waterview would be entitled to approximately $5.80 per kW as its Fee.

37. Of note, the net $139 per kW of critical IT load was an initial offer prior to any additional costs to be determined. For example, fit-out costs to be determined would necessarily impact the agreed upon MRC – with Waterview's Fee being 4%.

38. The fact that the varied compensation structure does not alter the economics of the initial proposed transaction demonstrates that Waterview's Fee was considered material from the inception of negotiations between TensorWave and Vantage.

39. Waterview's compensation was not an afterthought to be structured and agreed upon after the initiation of services.

40. Both TensorWave and Vantage knew from issuance of the LOI's at the inception of the relationship with Waterview that Waterview was to be entitled to a 4% Fee.

41. And Waterview sent the revised LOI to Vantage's Vice President of Sales, DelPrete, copying Horton.

42. Thus, Vantage had actual knowledge of Waterview's Fee from the outset of its own negotiations.

43. Told in writing – by text and by the email transmitting the revised LOI – that TensorWave would be paying Waterview's Fee, Horton did not object or dispute it, joked about discounting it, and permitted the revised LOI to go to Vantage in TensorWave's name. Horton – on behalf of TensorWave – thereby confirmed and subscribed TensorWave to Waterview's representation that Waterview was entitled to receive a 4% Fee following the consummation of a transaction between TensorWave and Vantage.

44. Upon information and belief, Horton documents TensorWave's fees to Waterview on transactions where TensorWave intends to pay. On or about July 13, 2026, Horton executed an

LOI on a separate transaction in Douglas, Georgia that names Waterview as the sole advisor and provides for a landlord-paid 4% Fee under a separate written agreement.

45. However, Horton would not execute a separate written agreement regarding the Vantage transaction.

46. Instead, Horton merely acquiesced by opportunistic silence and conduct to the written representations made by Waterview as to what the Fee agreement was based upon the oral agreements had with Horton.

47. On or about May 17, 2026, Thai sent Horton the names and email addresses of the Vantage personnel so that an introduction could be made to AMD – TensorWave's guarantor for the transaction.

**Horton Requests a Reduction in Waterview's Fee and Waterview Accepts Horton's Offer for a 3% Fee**

48. In or about late May 2026, Horton advised Tawil by phone that despite previously approving and authorizing the release of the LOI to Vantage (twice) – with both iterations including Waterview's entitlement to a 4% Fee – TensorWave would not pay a 4% Fee to Waterview.

49. Instead, Horton proposed a capped Fee.

50. On or about May 28, 2026, Waterview expressly rejected in writing any cap on its Fee noting that Waterview had "prioritized every opportunity [TensorWave's] way and declined opportunities where we would be competing against [TensorWave]" and that therefore a cap on Waterview's Fee would be unjust.

51. On or about May, 29 2026, Horton – on behalf of TensorWave – by phone proposed a 3% Fee to Waterview to be paid by TensorWave.

52. Specifically, Horton called Tawil and stated that TensorWave will not pay a 4%

Fee, instead proposing a 3% Fee by stating: "[Waterview will] ask for 3.5%, [TensorWave will] counter 1%, [Waterview will] come back a 3%, and we'll settle there."

53. After internal discussions and consideration, on or about May 30, 2026, Waterview agreed to TensorWave's proposed reduction in the Fee from 4% to 3%.

54. Specifically, Tawil messaged Horton stating: "We accept the 3% uncapped commission on the Quebec [sic] deal with [Vantage]."

55. Horton did not contradict or object to the statement that Waterview accepted a 3% Fee for its services on the Vantage deal. His next messages, on or about June 1, 2026 at 9:15 a.m., were "yo yo," "Douglas LOI when" and "also, are you guys in cannes?" – an inquiry about a separate transaction and a social invitation. He neither rejected nor corrected the 3% Fee.

56. And Waterview's forbearance upon other opportunities was real. On or about May 26, 2026, Waterview declined in writing an opportunity for a competing data center site rather than compete with TensorWave and forwarded the refusal to Horton.

57. Following Waterview's written representation that there was an agreed upon 3% Fee, Horton proceeded to direct Waterview to engage with Vantage in negotiations related to the deal.

58. Accordingly, Horton – on behalf of TensorWave – accepted by silence and/or acquiescence Waterview's recitation of what the Fee agreement was related to Waterview's compensation on the Vantage deal.

59. Thereafter, on or about June 12, 2026 at 11:27 a.m., Tawil emailed Horton, copying TensorWave's General Counsel and Thai, introducing Waterview's counsel, Eli Dweck of Wachtel Missry LLP, and requesting that the 3% Fee agreement be reduced to a signed writing. Tawil noted that the parties were "hours away from a signed LOI between Tensor[W]ave and

Vantage," that Waterview had previously sent TensorWave a Fee agreement prepared by Waterview's counsel, and that TensorWave had indicated it preferred to use its own form. Tawil asked TensorWave to forward its form "so my counsel can get it turned around quickly."

60. Specifically, Tawil stated that "[a]lthough the original LOI called for a 4% fee to Waterview … we have agreed with [Horton] … to reduce to 3%."

61. In response, Horton did not deny or dispute the 3% Fee or the fact that Waterview was acting as TensorWave's broker on the Vantage transaction.

62. Nor did anyone else at TensorWave deny or dispute the 3% Fee or the fact that Waterview was acting as TensorWave's broker on the Vantage transaction.

63. TensorWave's only response was to transmit its LOI template, which is not a Fee agreement. TensorWave never forwarded its form Fee agreement, and never provided a Fee agreement.

64. TensorWave, through Horton personally, was, however, able to turn a Fee agreement seemingly when it wished to. On or about June 19, 2026 at 3:46 p.m., regarding a different opportunity unrelated to Vantage, Horton emailed a landlord rep broker for a different data center, with Thai and Tawil on the email, attaching TensorWave's redlines of a Fee agreement between that landlord and TensorWave: "… Please see our redlines attached. Looking forward to working with you!"

65. Three hours later, at or about 6:56 p.m. on June 19, 2026, Tawil emailed Horton, copying Thai, attaching a Fee agreement for the Vantage transaction and requesting Horton's signature: "Please see attached advisory fee agreement for your signature. To simplify matters, we took the agreement you sent over to [the unrelated transaction] and adjusted it to our deal. We are open to any technical comments you have to get this done, but think it's more than reasonable to

execute at this time."

66. Horton did not sign it, did not comment on it, and did not respond. The same form Horton had redlined and returned to a different potential landlord for an unrelated transaction that very afternoon went unanswered when it bore Waterview's name.

67. However, TensorWave continued to direct Waterview's services and requested that Waterview engage in negotiations with Vantage to get the deal done.

68. Accordingly, to prevent the stalling and/or failure of the Vantage deal, Waterview continued to perform its requested duties in good faith based upon (1) Horton's verbal proposal of a 3% Fee, (2) Horton's acceptance by acquiescence to Waterview's written acceptance of Horton's proposed 3% Fee through text message and (3) Horton's continued acceptance by acquiescence to Waterview's written acceptance and representations of agreement between Waterview and TensorWave of a 3% Fee.

69. Beyond doubt, but for Waterview's continued efforts in negotiations, the Vantage deal would have failed, as expressly represented by Horton on multiple occasions whereby he repeatedly stated that the deal was in all likelihood dead.

70. Moreover, Waterview marked up a fee agreement that TensorWave had previously used and authorized, maintaining the material terms that TensorWave had already agreed upon with another entity.

71. Waterview – through its continued efforts at direction of TensorWave – managed to save the deal for TensorWave and Vantage.

**TensorWave Leadership Confirms the Fee Is Owed and Undertakes to Determine An Amount that TensorWave is Willing to Pay**

72. On or about June 25, 2026, Horton texted Waterview: "yo I briefed piotr" and "start the threads so I can connect you" – moving the Fee discussion from himself to TensorWave's



HF 18961985v.1

COO.

73. On or about June 29, 2026, Waterview had two separate phone conferences with TensorWave leadership.

74. Specifically, on the first call, Waterview spoke to Piotr Tomasik ("**Tomasik**"), TensorWave's COO, regarding the Waterview Fee for the Vantage deal.

75. Tomasik advised that the current form of the Fee agreement "has to change a lot" before it can be considered acceptable to TensorWave's board.

76. Though unknown to Waterview how much information Tomasik had at the time as related to Horton's modification request for a 3% Fee rather than the initial 4% Fee, it was apparent that Tomasik was aware of at least one of the iterations of the Fee arrangement agreed to by Horton.

77. At this point, Tawil clarified that Waterview had already agreed to a 3% Fee proposed by Horton which of itself was a downward departure from the 4% Fee previously agreed to by Horton on behalf of TensorWave.

78. Tomasik advised Waterview that TensorWave did not grant Horton authorization to make either the 4% or the subsequent 3% Fee offers.

79. Specifically, Tomasik advised Waterview that TensorWave's board rejects the current 3% Fee.

80. Instead, Tomasik advised that the board suggested a flat $1 million Fee.

81. In response, Thai stated that a flat $1 million Fee was unacceptable given the scope of services provided by Waterview and that an agreement had already been set and then modified once already.

82. Tomasik advised that he would contact Horton to determine what can be considered fair compensation to Waterview.

83. Ultimately, Tomasik advised that TensorWave "will be generous" and "will give [Waterview] something on this deal, no matter what."

84. Tomasik, Tawil and Thai agreed to continue the discussion on a subsequent phone call later that same day, with Waterview maintaining that an agreement was already established for a 3% Fee.

85. Thereafter, also on or about June 29, 2026, Tawil and Thai spoke to Aaron Baker ("**Baker**"), TensorWave's Vice President of AI Infrastructure.

86. Again, Tawil and Thai presented the history of the Fee structure: namely, (1) an initial 4% Fee paid by Vantage (agreed to by Horton on behalf of TensorWave) on an MRC paid by TensorWave to Vantage of $145 per kW that was (2) later restructured to a 4% Fee paid by TensorWave (agreed to by Horton on behalf of TensorWave) on an MRC paid by TensorWave to Vantage of approximately $139 per kW that was (3) later restructured with Horton (on behalf of TensorWave) to a 3% Fee.

87. Baker acknowledged the change in the economics of the proposed transaction between TensorWave and Vantage in relation to Waterview's Fee entitlement.

88. Moreover, Baker did not dispute that Horton had authorized – on behalf of TensorWave – the varied Waterview Fee structures that Tawil and Thai summarized on the phone call.

89. Instead, Baker advised Tawil and Thai that he would internally speak to Horton, Tomasik and TensorWave's broader leadership (as well as TensorWave's board) to determine whether TensorWave would be able to honor the Fee structure agreed to by Horton.

90. Accordingly, Baker – like Tomasik – represented that Horton did not have authorization to make the Fee agreements that he made with Waterview, despite Horton's

representations through words and conduct as TensorWave's CEO to Waterview that he had such present authorization.

91. In the alternative, Baker advised that following internal discussions with TensorWave's leadership – if Horton's agreed Fee structure could not be honored – TensorWave would present a proposal for yet another restructuring of Waterview's Fee agreement for consideration.

92. Notwithstanding, TensorWave committed to Waterview that it would not be disregarded and that it would be compensated in some fashion.

93. Based upon TensorWave's assurance related to compensation, Waterview continued to conduct itself as TensorWave's broker and did as directed by TensorWave.

94. Waterview did not concede that the 3% Fee agreement was invalid.

95. Moreover, at no point following the phone calls with Tomasik and Baker did any representative of TensorWave represent that Waterview would receive no compensation for its advisory role and services rendered on the Vantage transaction.

96. On the contrary, the sole purpose of the phone calls with Tomasik and Baker was to determine whether TensorWave leadership would honor the Fee structure already agreed to by Horton or, in the alternative, propose a restructuring of same for Waterview's consideration.

97. And on or about July 2, 2026, Tawil had a phone call with Horton wherein Horton agreed that he had previously agreed – on TensorWave's behalf as it's CEO – to the prior percentages but represented that in hindsight he may have been quick on the trigger as any deal that large would require board approval.

98. Indeed, Horton acknowledged that he had authorized the prior percentage agreements on TensorWave's behalf, but stated that in hindsight, board approval would have been

required.

99. Waterview has a recording of this phone call wherein Horton admits the foregoing.

100. At all relevant times, Horton, as TensorWave's CEO, possessed either actual or apparent authority to bind TensorWave to the Fee agreed upon. Indeed, TensorWave held Horton out as the person with whom Waterview was to deal with on all commercial terms of the Vantage transaction, and Waterview reasonably relied upon that authority.

101. TensorWave further ratified the 3% Fee arrangement after June 29, 2026 by continuing to accept and direct Waterview's services with knowledge of the Fee, including Horton's July 16, 2026 written instruction to Vantage to "please work with Waterview on this and send the updated MRC here."

102. To the extent TensorWave contends that Horton lacked authority to bind TensorWave to the Fee, Horton is personally liable to Waterview as set forth below.

**Vantage's Proposed Draft Lease Acknowledges Waterview's Involvement and Services**

103. On or about July 6, 2026, Vantage circulated the initial draft of the proposed lease between Vantage and Onde Tensorriel YQB Inc. ("**Onde**"), TensorWave's affiliate and/or subsidiary entity that would presumably assume the role of tenant under the proposed Vantage deal.

104. Therein, it states that TensorWave's recognized broker is Waterview.

105. Accordingly, even Vantage's documents reflect that Waterview was acting as a broker for TensorWave in connection with the negotiations and transaction.

106. Thus, Vantage was aware that an obligation existed to remit compensation to Waterview for its services.

**Again, Waterview Revives the Transaction After TensorWave Declares It Dead**

107. In mid-July 2026, Vantage returned with a fit-out cost of approximately $115.1 million CAD (approximately $81 million US), which drove the proposed MRC to $165 per kW. On or about July 13, 2026 at 9:00 p.m., Horton texted Waterview: "looks like Vantage is probably dead," "they want $165 to wrap in fitout," and "insane."

108. Within minutes, Waterview took the problem over. At or about 9:02 p.m. on July 13, 2026, Thai asked Horton to forward Vantage's numbers. At 9:06 p.m., Thai priced Vantage's ask: "Basically that's $58.7mm in today's dollars which is $1.8mm/mw."

109. At or about 9:35 p.m., Tawil wrote, "Let us work it." Horton responded, "have fun lol."

110. This was the second time Waterview kept the Vantage transaction alive. The first was in April 2026, when the initial call between TensorWave and Vantage went poorly and Vantage was prepared to walk away. This time it was TensorWave that had written the deal off, and Waterview that brought it back.

111. Accordingly, Horton – on behalf of TensorWave – approved of and continued to support Waterview's services for TensorWave.

112. Thereafter, while Waterview worked to negotiate with Vantage, on or about July 14, 2026, Horton expressly directed Waterview to "keep driving them down" in reference to the MRC.

113. Accordingly, at Horton's direction, Waterview took lead of the negotiations related to the fit-out and its impact on the MRC as that was justification Vantage provided for why the MRC ballooned.

114. This work by Waterview included leading negotiations with Vantage and its

estimator.

115. Additionally, Waterview engaged with a third-party contractor to re-price the fit-out scope – all for the benefit of TensorWave and at TensorWave's direction.

116. Waterview, however, grew concerned that following the June 29, 2026 calls, TensorWave would breach the Fee agreement and not pay any amount. Accordingly, Waterview proposed restructuring the Fee agreement so that it would be paid by Vantage – not TensorWave – and be included in the MRC, at 2%.

117. Specifically, it was Waterview's preference that the Fee be paid by Vantage, not TensorWave.

118. Waterview asked Horton by telephone whether it would be easier for TensorWave if a 2% Fee were included in the MRC and paid by Vantage. Horton orally responded that it would be "much easier."

119. On or about July 15, 2026, Tawil messaged Vantage (copying Horton) advising that at Horton's request, all discussions related to the MRC and fit-out costs should flow through Waterview and that TensorWave wanted Waterview to earn a 2% Fee on the total deal, to be paid by Vantage and baked into the MRC figure.

120. Additionally, also on or about July 15, 2026, Horton messaged Thai, providing TensorWave's support for Waterview's efforts by stating "get [Vantage] down to $150 [per kW] for everything, and we have a deal. I believe in you!"

121. Notably, Horton did not deny the accuracy of the July 15, 2026 representation by Tawil to Vantage.

122. Instead, Horton messaged Vantage on or about July 16, 2026 to confirm Tawil's representations. Specifically, Horton stated "please work with Waterview on this and send the

updated MRC here."

123. Also, on or about July 16, 2026, an agent of Vantage messaged Waterview asking what it will do with "20mm". Accordingly, Vantage understood that it was expected to fund Waterview's Fee through the MRC paid by TensorWave.

124. Thus, Horton – on behalf of TensorWave – once again accepted by acquiescence a writing that evidenced an agreement for Waterview's entitlement to a percentage Fee for its services.

125. Thereafter, negotiations ensued where Waterview successfully reduced the fit-out budget from approximately $115.1 million CAD (approximately $81 million US) to approximately $50.2 million US. And Waterview thereafter was able to continue in reducing the budget.

126. Indeed, a single observation by Waterview regarding tax treatment accounted for approximately $16 million CAD (approximately $11.2 million US) of that overall reduction.

127. Waterview also produced the yield-on-cost analysis, cost-of-capital and escalation analysis and the line-item budget challenges that framed the negotiations on TensorWave's behalf.

128. Ultimately, Vantage confirmed these fit-out reductions in writing on or about July 17, 2026 and July 21, 2026.

129. And on or about July 17, 2026, DelPrete advised that after reworking the fit-out costs to approximately $50 million US, Vantage "also had to factor in approximately $22M [US] in commission," producing an MRC of $161.64 per kW.

130. On or about July 20, 2026, Eric Hodge ("**Hodge**"), Vantage's Director of Commercial Investments confirmed in writing that the $72.465 million US basis underlying the $161.64 per kW rate included "rentalized lease commissions (being charged by Waterview that we are offering to rentalize as a gesture of good faith)."

131. Accordingly, both TensorWave and Vantage treated Waterview's compensation as a real and quantified material component of the negotiated transaction.

**TensorWave Misstates AMD's Position and Eliminates Waterview from the Transaction, Leaving Waterview with No Compensation**

132. On or about July 21, 2026, AMD wrote to Horton that "AMD can't bake in the broker Fee into the rent rate. Please remove that," while conceding in the same message that "if it's 2% of TCV that is about market."

133. Upon information and belief, AMD's objection to Waterview's compensation was structural as it concerned where the Fee sat in the MRC and whether AMD would be guaranteeing both TensorWave's obligation to Vantage and TensorWave's obligation to Waterview.

134. Notwithstanding, on or about July 22, 2026, despite the work Waterview had done at the request of TensorWave to secure the Vantage deal, Horton eliminated compensation entirely by sending a text message to Waterview stating: "[AMD] doesn't want you involved", "I recommend just working with us on other deals" and "[AMD] was able to negotiate a lower price than you were able to."

135. Horton's messages were sent at 4:10 p.m. and 4:11 p.m. on or about July 22, 2026.

136. At 8:43 p.m. that same evening – four and a half hours after Horton's messages – Vantage's Senior Director of Solutions Architecture and Engineering, Anthony Salinas ("**Salinas**"), emailed the Vantage fit-out cost chain, addressed to Baker, from TensorWave, and Thai, from Waterview, asking for times to schedule a call and go over the fit-out costs.

137. Accordingly, Vantage was still requesting Waterview's services on the day TensorWave purported to eliminate its Fee.

138. Moreover, Horton forwarded to Waterview the message AMD had sent him on July 21, 2026. In it, AMD objected only to including the Fee in the rent rate and conceded that 2% "is

about market." AMD did not state that it did not want Waterview involved. Horton's characterization to Waterview was not AMD's position.

139. Of course, with Waterview's agreed upon Fee being removed from consideration, any price struck would be less of a burden for TensorWave than that which Waterview last secured in its negotiations.

140. This is apparent because TensorWave effectively stripped $22M of its own financial obligations from the agreement.

141. On or about July 24, 2026, Waterview's counsel served litigation hold notices on TensorWave, Vantage and AMD. Within one day, TensorWave removed Waterview from a pending LOI on the Frankfort, Indiana transaction with DataOne Frankfort LLC and, on or about July 25, 2026, executed a version of that LOI from which Waterview had been removed.

142. Moreover, upon information and belief, the Vantage capacity has now been committed to TensorWave and AMD, or an affiliate, designee or successor of TensorWave and AMD at what is currently an unknown per kW MRC.

143. Thus, despite Waterview fully performing its obligations pursuant to directives issue by TensorWave and the agreements established between TensorWave and Waterview regarding compensation, TensorWave reaped the benefits of Waterview's performance while withholding Waterview's entitled compensation.

## AS AND FOR A FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT
## (Against All Defendants)

144. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

145. Defendants have challenged and/or disputed, by virtue of eliminating Waterview from the economics of the transaction between TensorWave and Vantage, the proper

characterization, rights, and entitlement of Waterview to payment for services already rendered in relation to the transaction.

146. An actionable and justiciable controversy exists in regard to same.

147. By reason of the foregoing, Waterview seeks a judicial declaration from this Court that: (i) a binding agreement exists by and between Waterview and TensorWave for payment to Waterview of a 3% Fee based upon the per kW MRC ultimately agreed to by and between TensorWave and Vantage; (ii) TensorWave cannot unilaterally eliminate Waterview from the transaction post-rendering of services by Waterview in avoidance of the aforesaid payment obligation; (iii) Horton, on behalf of TensorWave, bound TensorWave to the agreed upon obligation to pay Waterview's Fee; and (iv) Waterview's entitlement to its Fee attaches to the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees.

**AS AND FOR A SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT – MONEY DAMAGES**
**(Against TensorWave)**

148. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

149. Waterview and TensorWave entered into a valid and enforceable agreement for payment of Waterview's Fee.

150. This agreement, acknowledging the role Waterview played was memorialized in written LOI's and in written communications by and between TensorWave's CEO, Horton, and Waterview.

151. Specifically, the LOI's detailed a Fee structure based upon a percentage of the agreed upon per kW figure owed by TensorWave to Vantage as the MRC for the transaction.

152. This Fee structure, though the particular percentage changed over time, was never modified.

153. At all times post-agreement, Waterview was to be entitled to a particular percentage of the per kW figure owed by TensorWave to Vantage as the MRC for the transaction.

154. Indeed, Waterview's Fee was initially to be included in the MRC amount, at a 4% figure, with Vantage bearing the responsibility to remit same to Waterview post payment by TensorWave.

155. That structure was modified, at a 4% figure, to require TensorWave to remit same to Waterview outside of the MRC obligation to Vantage with the MRC accordingly reduced to account for same.

156. Though the Fee structure was modified on occasion as negotiations over the ultimate transaction progressed and fluctuating between a TensorWave direct payment to Waterview versus TensorWave to Vantage to Waterview payment, at no point was the Fee structure regarding Waterview's entitlement to a percentage of the agreed upon per kW MRC in dispute.

157. It was settled that irrespective of which party, TensorWave or Vantage, ultimately bore the obligation to pay Waterview, the Fee amount was included in the economics of the transaction and the MRC would be adjusted accordingly to account for which party was obligated to make payment to Waterview.

158. The structure merely confirms that at all times TensorWave was financially obligated to satisfy Waterview's Fee, either directly or indirectly through the MRC calculation to be paid to Vantage.

159. And though the percentage of Waterview's Fee was modified to 3%, the fact that

Waterview was contractually entitled to a Fee was never in dispute.

160. Accordingly, through writings, agreement to the percentage of the Fee was accepted by virtue of TensorWave's silence and continued enjoyment of Waterview's services.

161. Thereafter, TensorWave and Vantage removed Waterview from the transaction economics entirely asserting that Waterview was not entitled to any compensation for services rendered.

162. By reason of the foregoing, Waterview has been damaged and seeks damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against TensorWave)**

163. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

164. Waterview and TensorWave entered into a valid and enforceable agreement for payment of Waterview's Fee.

165. TensorWave, through its CEO – Horton – agreed to be bound by the agreement with Waterview for services.

166. The agreement between TensorWave and Waterview contains an implied covenant of good faith and fair dealing, which imposes on those bound the obligation to act in good faith and the deal with Waterview fairly under the agreement.

167. TensorWave and/or its affiliates or designees have not dealt fairly with Waterview under the agreement and have taken acts to prevent Waterview from entitlement to its Fee for

services already rendered, *i.e.*, the fruits of its bargain under the agreement.

168. TensorWave and/or its affiliates or designees have acted in bad faith by eliminating Waterview from the transaction with Vantage for the sole purpose of avoiding payment of Waterview's Fee.

169. As result of the foregoing, Waterview has incurred damages separate and apart from damages arising from breach of the agreement with TensorWave, including but not limited to the expenses and attorneys' fees and costs incurred by Waterview in making demands, and engaging in other correspondence with TensorWave, Vantage and AMD to protect its rights.

170. The breaches of the implied covenant of good faith and fair dealing have proximately caused, and continue to proximately cause, consequential damages to Waterview.

171. Consequential damages for breach of the implied covenant of good faith and fair dealing were reasonably contemplated by the parties at the time they entered into the agreement.

172. By reason of the foregoing, Waterview has been damaged and seeks damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**(Against TensorWave and Vantage)**

173. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

174. Waterview conferred a benefit on TensorWave, Vantage and their affiliates and designees when it acted as a broker to the transaction and handled negotiations for same.

175. TensorWave and Vantage are retaining benefits conveyed without compensating Waterview for same.

176. Indeed, TensorWave was obligated to either pay directly to Waterview the agreed upon Fee for Waterview's services or pay indirectly same to Vantage for subsequent payment to Waterview.

177. And Vantage was aware that it was expected to provide Waterview with the Fee for its services that TensorWave had agreed to.

178. Specifically, Vantage was aware that the MRC calculation was, in part, based upon the inclusion of Waterview's Fee.

179. The MRC that was owed by TensorWave to Vantage was inflated to account for the Fee owed from TensorWave to Waterview, to be remitted by Vantage once received from TensorWave.

180. It is against equity and good conscience to permit either TensorWave or Vantage to keep the portion of the MRC that Waterview was entitled to receive under the facts alleged herein.

181. By reason of the foregoing, Waterview seeks damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**QUANTUM MERUIT (IN THE ALTERNATIVE)**
**(Against TensorWave and Vantage)**

182. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

183. Waterview conferred a benefit on TensorWave, Vantage and their affiliates and designees when it acted as a broker to the transaction and handled negotiations for same.

184. Waterview preformed its services for TensorWave and Vantage in good faith, despite frequent dispute with TensorWave regarding compensation structure following the acceptance of Fee arrangements.

185. TensorWave and Vantage accepted the services with the understanding that payment to Waterview for the services was expected.

186. Indeed, both TensorWave and Vantage, in writing, made repeat reference to Waterview's Fee arrangement and entitlement to compensation as built into the MRC rates being negotiated.

187. Waterview, in performing the services in good faith to consummate a deal by and between TensorWave and Vantage reasonably expected compensation for its services.

188. At minimum, it is undisputed that 2% of the MRC is a fair market value for the services rendered, as conceded in writing by AMD, TensorWave's guarantor.

189. Notwithstanding the foregoing, TensorWave and Vantage are retaining benefits conveyed without compensating Waterview for same.

190. By reason of the foregoing, Waterview seeks damages in the amount of 3% – but at minimum 2% as admitted to be the fair market value for services rendered – of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**FRAUD / FRAUD IN THE INDUCEMENT**
**(Against Horton)**

191. Plaintiff repeats and realleges the allegations set forth above as though fully set

forth below.

192. Horton made fraudulent statements of fact and/or omissions of material fact as set forth with specificity herein.

193. The fraudulent statements of fact and/or omissions of material fact set forth with specificity herein were collateral to the agreement between TensorWave and Waterview and/or any other agreements between TensorWave and Waterview.

194. Indeed, the fraudulent statements of fact and/or omissions of material fact relate to Horton's representations of present authority to bind TensorWave to the Fee agreement with Waterview.

195. While the breach of the agreement between TensorWave and Waterview is subject to additional causes of action related thereto, Horton's representations as the CEO of TensorWave that he had the present authority to bind TensorWave to any agreement with Waterview is collateral to the ultimate breaches.

196. Where the breaches relate to TensorWave's failure to comply with the agreement, the fraud by Horton is the representations that he had present authority to bind TensorWave to an agreement.

197. On the contrary, as evidenced by subsequent communications with TensorWave's leadership, Horton purportedly did not have authorization to bind TensorWave despite his representation that he did.

198. Horton, as CEO of TensorWave, necessarily knew that the statements and/or omissions made were false, or created the impression of a state of false facts.

199. The statements and/or omissions were made with the intent to deceive, and did deceive.

200. Waterview reasonably and justifiably relied upon the statements and omissions made.

201. Horton participated directly in the fraudulent conduct, or had knowledge of the fraud.

202. And the conduct in issue caused actual harm to Waterview and caused Waterview to enter into the agreement with TensorWave to render its advisory services (and to continue to render its advisory services) upon fraudulent information and belief, intentionally fostered by Horton that he had the authority to bind TensorWave to the Fee arrangements with Waterview that he agreed to.

203. The conduct in issue was willful, wanton, malicious and in reckless disregard of the truth and rights of Waterview.

204. By reason of the foregoing, Waterview is entitled to damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
## (Against Horton)

205. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

206. There exists a special or privity-like relationship between Waterview, on the one hand, and Horton, on the other hand.

207. Waterview had previously worked with Horton.

208. The foregoing Defendant made false statements of fact and/or material omissions of fact as set forth with specificity herein.

209. Namely, Horton made false statements of present fact regarding the authority he,

as CEO of TensorWave, had to commit TensorWave to an agreement with Waterview for a particular Fee structure.

210. Waterview reasonably and justifiably relied upon the statements and omissions made.

211. The conduct in issue caused actual harm to Waterview and caused Waterview to render services for TensorWave upon false information and understanding.

212. Horton's conduct was undertaken in reckless disregard to the truth and the rights of Waterview.

213. By reason of the foregoing, Waterview is entitled to damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF AUTHORITY
## (Against Horton)

214. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

215. Horton, at all times relevant to the allegations set forth above, was the CEO of TensorWave.

216. In communications with Waterview, Horton acted in his representative capacity as the CEO of TensorWave.

217. In so doing, Horton – on behalf of TensorWave – engaged Waterview for its advisory/brokerage services.

218. This engagement by Horton was on behalf of TensorWave for Waterview to act as a broker in assisting TensorWave in securing critical IT load from Vantage.

219. The agreement executed by Horton with Waterview was on behalf of Horton's

principal, TensorWave.

220. In all communications with Waterview, Horton acted as an agent for TensorWave.

221. Horton agreed to particular Fee arrangements with Waterview, including an initial 4% structure and then later a modified – upon consent granted by Waterview – 3% structure.

222. As discovered by Waterview through subsequent communications with TensorWave's additional leadership when disputes arose related to Waterview's entitlement to payment, Horton was not authorized by TensorWave or its board to agree to either Fee arrangement with Waterview when he agreed to the respective Fee arrangements.

223. Waterview reasonably and justifiably relied upon the statements and omissions made.

224. And the conduct in issue caused actual harm to Waterview and caused Waterview to enter into the agreement with TensorWave to render its advisory services (and to continue to render its advisory services) upon fraudulent information and belief, intentionally fostered by Horton that he had the authority to bind TensorWave to the Fee arrangements with Waterview that he agreed to.

225. The conduct in issue was willful, wanton, malicious and in reckless disregard of the truth and rights of Waterview.

226. By reason of the foregoing, Waterview is entitled to damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**PROMISSORY ESTOPPEL (IN THE ALTERNATIVE)**
**(Against TensorWave)**

227. Plaintiff repeats and realleges the allegations set forth above as though fully set forth below.

228. TensorWave promised to pay Waterview a Fee of 3% of the MRC.

229. It was reasonable and foreseeable that Waterview would rely upon this promise.

230. Waterview reasonably and justifiably relied upon the promise made.

231. Indeed, Waterview sought confirmation of the promise and agreement in writing and thereafter acted pursuant to TensorWave's instruction to negotiate the transaction with Vantage to TensorWave's specifications.

232. Throughout the negotiations with Vantage, Waterview continued to communicate with TensorWave about the remittance of the Fee.

233. Accordingly, the Fee to Waterview was a material aspect of the transaction and TensorWave was necessarily aware of same.

234. By removing Waterview from the transaction structure altogether imposed injury upon Waterview.

235. TensorWave's refusal to abide by its promise caused actual harm to Waterview.

236. Indeed, Waterview saved the deal with Vantage and successfully got the deal to the finish line; yet, Waterview was cut out shortly before the deal was consummated for the sole purpose of avoiding payment of Waterview's Fee.

237. By reason of the foregoing, Waterview seeks damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Waterview prays that this Court order the following relief in its favor and against Defendants as follows:

1. On the First Cause of Action for Declaratory Judgment, a judicial declaration that:
    a. a binding agreement exists by and between Waterview and TensorWave for payment to Waterview of a 3% Fee based upon the per kW MRC ultimately agreed to by and between TensorWave and Vantage;
    b. TensorWave cannot unilaterally eliminate Waterview from the transaction post-rendering of services by Waterview in avoidance of the aforesaid payment obligation;
    c. Horton, on behalf of TensorWave, bound TensorWave to the agreed upon obligation to pay Waterview's Fee; and
    d. Waterview's entitlement to its Fee attaches to the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees.
2. On the Second Cause of Action for Breach of Contract, damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.
3. On the Third Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing, damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.
4. On the Fourth Cause of Action for Unjust Enrichment, damages in the amount of 3%

of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

5. On the Fifth Cause of Action for Quantum Meruit, damages in the amount of 3% – but at minimum 2% as admitted to be the fair market value for services rendered – of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

6. On the Sixth Cause of Action for Fraud / Fraud in the Inducement, damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

7. On the Seventh Cause of Action for Negligent Misrepresentation, damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

8. On the Eighth Cause of Action for Breach of the Implied Warranty of Authority, damages in an amount to be determined at trial, pre- and post-judgment interest, attorneys' fees and costs, punitive damages and all other relief the Court deems just and proper.

9. On the Ninth Cause of Action for Promissory Estoppel, damages in the amount of 3% of the per kW MRC agreed to in the consummated lease agreement by and between TensorWave and Vantage or their affiliates or designees, consequential damages, pre-

and post-judgment interest, attorneys' fees and costs, and all other relief the Court deems just and proper.

Dated: October 21, 2026
New York, New York

By: ______________________________

Avery Mehlman, Esq.
Jared Hotchkiss, Esq.
**HERRICK, FEINSTEIN LLP**
Two Park Avenue
New York, NY 10016
Tel: 212.592.1400
Fax: 212.592.1500
amehlman@herrick.com
jhotchkiss@herrick.com

*Attorneys for Plaintiff,*
*Waterview Power Group LLC*